Edward HEWES Plaintiff

v.

Martin MAGNUSSON,
et al, Defendants

No. CIV.03–106–B–K.

United States District Court,
D. Maine.

Dec. 13, 2004.

Edward L. Hewes, Warren, ME, Pro se.

Susan A. Sparaco, Assistant Attorney General, Augusta, ME, for Martin Magnusson, Individually and in his official capacity, Jeffrey Merrill, James O'Farrell, Nelson Riley, Leadi Dardis, Robert Costigan, Rudy Hamm, Margaret Dunn, Karen Anderson, Brian Abbott, Kevin Burns, Polly Black, James Roberts, Anne Rourke, Bartholomu Virgie, Defendants.

***Order on Motion to Exclude Expert Testimony and Memorandum of Decision[1] on Defendants' Motion to Dismiss/for Summary Judgment and Plaintiff's Motion for Summary Judgment***

KRAVCHUK, UNited States Magistrate Judge.

This matter is before the court on defendants' motion to exclude plaintiff's expert

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magis-

witnesses (Docket No. 55), the defendants' motion to dismiss or alternatively motion for summary judgment (Docket No. 56) and plaintiff's response to that motion which he also suggests is a motion for summary judgment (Docket No. 76). I now **GRANT** the defendants' motion for summary judgment and enter judgment on behalf of all defendants and **DENY** Hewes's motion to the extent that it is a cross-motion for summary judgment. The expert testimony that the defendants seek to exclude is not relevant to the issues raised by the cross-motions for summary judgment and the motion to exclude expert witnesses is **MOOT** in light of the entry of judgment on behalf of all defendants.[2]

### Discussion

### I.  Summary Judgment Standard

Rather than operating under the framework of a motion to dismiss, I take the defendants up on their alternative request for summary judgment and address the record they have compiled. Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). If the defendant meets this burden, Hewes must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted). I view the record on summary judgment in the light most favorable to Hewes, the nonmovant, drawing all reasonable inferences in his favor. *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir.2000).

In presenting their case for summary judgment, the defendants have complied with Federal Rule of Civil Procedure 56 and the District of Maine Local Rule of Civil Procedure 56. In addition to their summary judgment memorandum the defendants have filed a statement of material facts (Docket No. 57) that contains extensive record citation to Hewes's own deposition (*id.* attachs. 1 & 2).

Proceeding *pro se*, Hewes has filed a document entitled: "Plaintiff's Motion for Summary Judgment Pursuant to Fed. R. Civ. P., Rule 56[,] In Response to the Defendants' Motion to Dismiss or Alternatively for Summary Judgment." "Now comes the Plaintiff," the pleading commences, "and moves to demonstrate ... why the Defendants' motion to dismiss/motion for summary judgment should not be granted, and why Plaintiff's motion for summary judgment should be granted." The clerk docketed the pleading as both a motion for summary judgment and a response to the defendants' motion for summary judgment.

The amended scheduling order in this case fixed June 4, 2004, as the dispositive motion deadline. As to Hewes's hybrid response/motion, filed on September 16, 2004, the motion aspect of it is untimely. Moreover, had it been timely filed, the motion does not comply with Local Rule 56 and Hewes is not entitled to have his pleading treated as a motion for summary

---

trate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

**2.**  Hewes designated as "expert witnesses" a number of fellow prisoners. As best I can tell these "experts" would testify as to their own experiences vis-à-vis prison policy and procedures. Based upon those experiences, the "experts" would be prepared to offer their opinions regarding the constitutionality of certain prison policy and procedures.

judgment.[3]

With respect to this pleading as a response to the defendants' motion for summary judgment, Hewes has not complied with subsections (c) and (e) of the Local Rule, which provides:

(c) Opposing Statement of Material Facts

A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.

. . . . .

(e) Statement of Facts Deemed Admitted Unless Properly Controverted; Specific Record of Citations Required

Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

Dist. Me. Loc. R. Civ. P. 56(c),(e). The fact that he is a *pro se* plaintiff does not liberate Hewes from this pleading burden. *Parkinson v. Goord*, 116 F.Supp.2d 390, 393 (W.D.N.Y.2000) ("[P]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."); *see also Sirois v. Prison Health Servs.*, 233 F.Supp.2d 52, 53–55 (D.Me. 2002). Thus to the extent the defendants' statement of material facts, largely taken from Hewes's own deposition testimony, is properly supported with record citations, those facts are deemed admitted pursuant to District of Maine Local Rule 56(e).

What Hewes's two summary judgment pleadings do convey is, one, Hewes is first and foremost convinced that he was not provided with adequate photocopying privileges at the Maine State Prison and, two, his ability to prove his various claims in this action is dependent on the production of enumerable documents relating to his past legal proceedings, prison operations, and statutes and rules. (*See* Pl.'s Mem. & Resp. ¶¶ 5–17; Pl.'s Resp to Reply ¶ 1.) Hewes argues that he has "done everything humanly possible under the sun on god's green earth to obtain photocopy service to submit relevant documents." (Pl.'s Resp. to Reply ¶ 1.) What Hewes has failed to grasp is that he did not need to produce every document under the sun to

---

**3.** Hewes should rest assured that I am not granting summary judgment to the defendants because Hewes misspelled two of the defendants' names nor am I granting summary judgment on federal constitutional claims because he failed to comply with the Maine Tort Claims Act. In his responsive pleading Hewes took exception to these two asides in the defendants' memorandum in support of its motion for summary judgment.

make his case, he only needed to provide documents *relevant* to his claims, and, if unable to copy these within the 100–page limit on free copies he faced, he needed to alert the court to the *specifics* of what documents went uncopied and why he needed them to prove his § 1983 claims. As it is, Hewes has almost uniformly failed to describe what the evidence is that underlies certain claims that he was unable to produce and why it was relevant to his claim. Hewes has been diverted from a proper prosecution of his action by this fixation on his inability to copy all the items he envisioned (much of which seems from the description he does provide to be entirely irrelevant to his underlying claims).[4]

## II. Material Facts

### Prior Legal Proceedings

Edward Hewes has been housed at the Maine State Prison (MSP) since December 5, 1995. He is serving concurrent sentences for gross sexual assault and unlawful sexual contact. Hewes appealed his conviction and the appeal was denied by the Law Court. *State v. Hewes*, 1997 Me.

52, 691 A.2d 1197. Hewes then challenged his convictions through a petition for post-conviction review. Among Hewes's claims in his post-conviction petition was that he was denied effective assistance of counsel because counsel decided to forego forensic testing of certain evidence. The Maine Superior Court denied the petition for post-conviction review in a decision dated August 13, 1998.

On October 27, 2000, Hewes filed a petition for writ of habeas corpus with this court. On April 4, 2001, the magistrate judge recommended dismissal of the petition as untimely pursuant to 28 U.S.C. § 2244(d)(1)(A). In his recommended decision, the magistrate judge noted that Hewes offered no explanation for his delay in filing other than the time it took for him to obtain transcripts due to his lack of finances. The magistrate judge also found that Hewes's petition did not come within the provision of 28 U.S.C. § 2244(d)(1)(D) pertaining to "newly discovered evidence" because Hewes knew of the evidence when he filed his post-conviction petition but yet filed his 28 U.S.C. § 2254 petition more

---

**4.** Hewes spends a great deal of time in these various pleadings bemoaning his inability to obtain free photocopies from either the State or the Longtimers' Group, a group of prison inmates who apparently have low cost photocopying options available to them. However, Hewes's lack of photocopying materials has nothing to do with his failure to prepare and file a response to the defendants' statement of material facts and his own additional statement of material facts. One need only review the docket in this case to ascertain that Hewes has filed many, many pages of pleadings and exhibits with this court. Had Hewes prepared and filed such a document and indicated to the court that he was unable to provide a copy of the record citation he listed in support of his material fact because of his photocopying woes, I would have been attentive to his concern. However, rather than proceed in accordance with our Local Rule, Hewes simply lists a hodgepodge of exhibits

he would like to have been able to copy and provide to the court, without tying those exhibits to any material statement of facts. For instance, Hewes complains that he could not photocopy hospital records relating to the assault involving fellow inmate, Michael Chasse, but I do not see how that is material to the issues raised in the motion for summary judgment. The defendants do not dispute that Hewes was assaulted by Chasse (one of Hewes's designated expert witnesses). Hewes also complains that he could not photocopy the various prison laundry schedules, but the defendants have included Hewes's deposition testimony on that score and the court accepts that testimony about the laundry duties impinging on Hewes's library time. If there is something of substance surrounding this photocopying dispute, Hewes has managed to bury it so deep in the record that I am unable to put my finger on it.

than one year thereafter. On July 9, 2001, the District Court judge affirmed the recommended decision. On January 29, 2002, the First Circuit Court of Appeals denied Hewes's request for a certificate of appealability for the reasons stated in the recommended decision. Hewes then filed a petition for *writ of certiorari* with the United States Supreme Court. The filing was post-marked on April 25, 2002, and received by the Court on May 7, 2002. By letter dated May 10, 2002, the Clerk's Office of the United States Supreme Court returned Hewes's submissions to him because he had failed to include the lower courts' orders in the appendix of the petition as required by court rule. The letter from the United States Supreme Court's clerk's office instructed Hewes to correct the deficiencies and to resubmit his petition as soon as possible, warning that unless the petition was received in the corrected form within sixty days the petition would not be filed. Hewes received this letter on the 15th or 16th of May 2002. Hewes's petition for *certiorari* review was received by the United States Supreme Court on July 18, 2002, but was post-marked on July 11, 2002. The United States Supreme Court deemed the petition untimely. Hewes attributes this untimeliness of his filing to being "caught up" in statutory changes being made to state and federal law.

### Access to Library

It is undisputed that Maine State Prison inmates may use the law library five days per week during their daily three-hour recreation period. Hewes estimated that because he must attend to other needs—such as laundry and hygiene—during these hours, he is only able to spend about four and one-half hours per week in the law library. Prisoners are allowed, however, to take books back to their cells. They are also allowed to request additional li-brary time if it is necessary to meet a court deadline. Hewes requested additional library time once to type his habeas corpus petition but was denied. He never again requested permission for additional time in the law library.

### Adoption of Disciplinary Policy 20.1

On January 30, 2002, Department of Corrections Commissioner Martin Magnusson adopted chapter 10 subsection 20.1 governing adult prisoner disciplinary procedures as an emergency rule. The rule was approved as to form and legality by Christopher C. Leighton, Assistant Attorney General on January 31, 2002, and was accepted for filing by the Secretary of State's Office on February 1, 2002. The agency's findings with respect to the existence of an emergency are set forth in the rule's basis statement and concern the imminent opening of the new Maine State Prison. Hewes was never disciplined under this emergency rule. However, Hewes believes the Commissioner and Warden had rulemaking notices removed from newspapers; a fellow inmate told Hewes that the notices were missing from some papers.

### April 5, 2002, Prison Demonstration

On April 5, 2002, Hewes and approximately 150 other inmates wore sweat clothes to the chow hall in what prison officials believed was a prison demonstration. Hewes and the other inmates who had worn sweat clothes to the chow hall were placed in administrative segregation. Hewes was placed in administrative segregation under the administrative segregation criteria on the grounds that he posed a potential threat to security or orderly management of the facility. On April 10, 2002, while in administrative segregation, Hewes received two legal accordion folders full of materials from Officer Brian Abbott. Hewes received more of his legal materials from Caseworker Phil Edwards on April

22, 2002. Hewes remained in administrative segregation from April 5, 2002, through May 2, 2002. This placement in administrative segregation deprived Hewes of the opportunity to earn good-time credits for participation in a work program. However, Hewes was never punished under the prison's disciplinary rules for any conduct related to the April 5, 2002, incident.

### Michael Chasse Incidents

In June 1995, while confined in the Penobscot County jail, Hewes was assaulted by fellow inmate Chasse. Hewes provided a statement regarding the assault to correctional officers at the jail.

Hewes did not see Chasse again until December of 1997 when both men were assigned to work in the MSP kitchen. When Hewes saw Chasse in the kitchen, he mentioned to the kitchen supervisor, Spencer Smith, that he had had a confrontation with Chasse at the county jail and did not know whether Chasse was holding a grudge against him. Hewes did not request to be reassigned allowing that "nothing was going on." Hewes did not anticipate having any problems with Chasse at this time and he does not remember whether he mentioned his prior history with Chasse to any other prison official.

Hewes continued to work with Chasse in the kitchen and to see Chasse in the prison laundry without incident until April 28, 1998. On April 28, 1998, Chasse assaulted Hewes outside of the prison cafeteria. Correctional officers intervened in the assault and placed both Hewes and Chasse in administrative segregation.

In early May Hewes's placement in administrative segregation was reviewed by the administrative segregation board. Based upon the administrative segregation board's recommendations, Hewes was released from administrative segregation. Hewes did not see Chasse again until[5] Hewes, along with other prisoners who had been housed in administrative segregation for the "prison demonstration," was released to the A-pod housing unit. When Hewes arrived on the unit he saw Chasse. Hewes states that after spotting Chasse, he approached Officer Virgie and requested a transfer and that he told Officer Virgie that Chasse had beat him in the county jail and had tried to kill him at the old prison because of a statement that he had provided to jail officials at the county jail. According to Hewes, Officer Virgie told him that there was nothing that he could do and that Hewes needed to submit a written request to move to a different housing unit. Hewes states that on May 2, 2002, he submitted a written request for a transfer to Leida Dardis for the reasons that he had stated to Officer Virgie; he did not receive a response from Dardis. A few days after arriving on the A-pod and seeing Chasse, some inmates commented to Hewes that Chasse was showing paperwork regarding Hewes's jail report to other inmates. Hewes did not pay attention to these comments. He did not express concern to prison staff that Chasse was making comments about him to other inmates. Hewes did not believe that he had problems with any other inmates at the time.

### May 19, 2002, Confrontation with Unknown Inmate

On May 19, 2002, an inmate unknown to Hewes at the time, entered Hewes's cell, referred to him as a rapist and a rat, and told him that he would have to leave. A scuffle ensued during which Hewes was

---

5. The defendants' statement of material fact states that this reuniting took place on May 2, which would place it before the May 4 review. Hewes affirmed the May 2 date in his deposition testimony vis -à-vis a leading question. The actual dates are not dispositive.

able to pin the inmate in the corner of his cell. Hewes threw the inmate to one side and told him to get out. Hewes had never had any prior conversations, conflicts, or interactions with this inmate. And, as Hewes has not had any altercations with Chasse since April 28, 1998, he believes that Chasse must have incited the inmate to confront Hewes by showing him Hewes's jail report and a news article about Hewes because the inmate referred to Hewes as a rapist and a rat

Hewes believes that Defendants Merrill, Magnusson, O'Farrell, Virgie and Dardis intentionally moved Chasse to Hewes's housing unit to harm Hewes, although he admits that he has no evidence to support this belief other than the "sequence of events." Hewes suspects that other inmates may know about the nature of his crimes. He has had no other altercations with inmates.

### Administrative Segregation May 19, 2002, through June 5, 2002

After Hewes was attacked on May 19, 2002, by the unknown assailant, Hewes was approached by Sergeant Ruel and Hewes requested a transfer. Ruel asked Hewes what had happened to his face but Hewes refused to provide Ruel with any information about the incident, insisting only that he be allowed to move.

Hewes was brought to the hospital to be checked. At the prison hospital, Hewes was met by Sergeants Doyle and Brown. Sergeant Doyle attempted to get information from Hewes regarding the incident but Hewes again refused to provide any information. After refusing to tell the officers what had happened, Sergeant Ruel ordered Hewes to be placed in administrative segregation based upon a threat to Hewes's safety. On May 22, 2002, Hewes appeared before the administrative segregation board to review his placement in administrative segregation. Hewes re-fused to provide the administrative segregation committee with any information about who had assaulted him. Administrative Segregation Committee Member and Unit Manager Starbird told Hewes that he did not know how to protect Hewes in the general population if Hewes refused to tell them who had assaulted him. The committee recommended that Hewes remain in administrative segregation pending further review in seven days. Hewes appealed the committee's recommendation, asserting that he was being punished for refusing to identify the individual who had assaulted him and for litigation that was pending in federal court.

On May 30, 2002, Hewes appeared again before the administrative segregation committee. Hewes insisted that nothing would happen if allowed to return to population. The committee recommended Hewes's release to the Close unit. Hewes was released from administrative segregation on June 5, 2002, and was permitted to move to a different housing pod in the Close unit following his release.

### Hewes's Access to Courts to Move for an Injunction

On December 31, 2001, Hewes filed a request for an injunction with this court to stop Maine Department of Corrections from moving prisoners to the new Maine State Prison in Warren. In the motion, Hewes listed a host of complaints largely focused on the prison's rules regarding prisoners' access to the law library and to legal materials in their cells. Hewes filed similar motions with the First Circuit Court of Appeals and the United States Supreme Court at the same time. This court denied the motion on January 3, 2002, because it was "facially without merit." The First Circuit denied Hewes's motion on January 8, 2002. The United States Supreme Court, through its Clerk's Office, advised Hewes by letter dated Jan-

uary 18, 2002, that the Court was unable to assist Hewes on the motion as it had not been properly brought before the Court. On January 10, 2002, Hewes filed with the First Circuit a "Petition for Review," apparently attempting to appeal the District Court's disposition of his motion to obtain an injunction. The First Circuit denied the petition for review on January 29, 2002. Hewes then filed a "Petition for Review" with the Supreme Court. On March 12, 2002, the Supreme Court, through its Clerk's Office, returned Hewes's petition for review by letter dated March 12, 2002, indicating that the filing did not conform to the rules as it did not contain the lower court's opinions. The Supreme Court's March 12, 2002, letter advised Hewes to correct the deficiencies and return his petition as soon as possible, warning that unless the petition was received in corrected form within sixty days, the petition will not be filed. Hewes concluded that the Supreme Court had erroneously construed his "petition for review" as a petition for certiorari on a habeas corpus.

Hewes had also filed a "Motion for Reconsideration" on his "Petition for Review" with the First Circuit which the First Circuit denied on March 7, 2002. Hewes concluded that he had ninety days from the First Circuit's denial of his motion for reconsideration to refile his petition for review with the Supreme Court. Hewes started working on his revised petition for review to the Supreme Court on April 30, 2002. He mailed the revised petition on June 3, 2002. The Supreme Court returned the petition on June 19, 2002. Hewes asserts that the petition was returned because he failed to mail a copy of it to Attorney General Steven Rowe. By January 2002 Hewes's petition for writ of habeas corpus regarding his criminal conviction had already been denied by the District Court on the grounds of untimeliness.

### Hewes's Job Suspension from the Education Department

On June 24, 2002, Principal Polly Black dismissed Hewes from his work assignment as an "a.m. pod cleaner" (janitor) in the education department after Hewes refused Black's instruction to prepare a written job description of his duties. Black had asked Hewes to prepare the job description on the Thursday prior to May 24, 2002. Hewes told Black that he would when he had a chance but was busy preparing his habeas corpus petition for the United States Supreme Court. On the following Monday, May 24, 2002, Black asked Hewes whether he had completed the job description. Hewes responded: "No I didn't have time." According to Hewes, Black said, "Well you are going to have to go in the computer and do that." Hewes asserts that he responded as follows: "No, that is not my job. I can't govern another inmate's behavior; it is against the law in the first place." Hewes states, however, that he was going to prepare the job description as requested but, as he explains, "I got to the point and she was being real demanding about it." [I] said, "No, I am not 'doing' that, I just won't do it. I have been up all night with glasses on trying to protect myself. I am not going and sitting behind a [screen]. I refuse to do it." According to Hewes, at that point, Black responded, "That's it, you are done." At the time, Hewes believed that Black was just firing him for refusing to do what she had instructed; but some time later, Hewes formed the belief that prison officials had set up the situation to force Hewes on standby status as a punishment for "continuing to litigate against the way they promulgated the rules." In support of this belief, Hewes points to the fact that he had just submitted a letter

challenging the prison's disciplinary rule and the prison's handling of the prison demonstration to the Warden. Hewes also points to the fact that Robert Costigan, whom Hewes describes as the Warden's right-hand man, was in Black's office when she told him that Robert Costigan said that Hewes needed to write a job description of his janitorial duties.

The classification committee reviewed Hewes's job dismissal. Hewes believes that the classification committee upheld the suspension to conceal the fact that Black allegedly fired him for continuing to litigate against the alleged illegal rulemaking. Hewes believes that if the classification committee was not attempting to conceal some wrong-doing the committee would have provided Hewes with a specific policy or rule that he violated when he refused to follow his supervisor's instructions. Hewes admitted to the classification committee that he had refused Black's instruction. The classification committee upheld the dismissal.

Hewes appealed the classification committee's decision regarding his suspension from his janitor's job. Deputy Warden Nelson Riley upheld the classification committee's decision on appeal. Hewes also filed a grievance concerning his job dismissal. Grievance Review Officer Robert Costigan advised Hewes that the classification decision regarding his job suspension needed to be appealed through the process for unit management review and not through the grievance process. Hewes appealed Costigan's decision to Warden Merrill. Merrill also advised Hewes that he needed to pursue his appeal of the classification decision with an appeal to the unit classification committee. Hewes, then, appealed Merrill's response to Commissioner Magnusson. Magnusson told Hewes that classification decisions had their own appeal process but also advised Hewes that a supervisor had every right to terminate Hewes if she believed that he had not met the requirements that she had established.

### Hewes's Superior Court Action Regarding Job Suspension

Hewes filed a petition for judicial review challenging Black's suspension of him from his janitor's job pursuant to 5 M.R.S.A. §§ 11000–11008 and Maine Rule of Civil Procedure 80C. He sought to serve eleven defendants with this petition for judicial review.

Hewes is allowed 100 free photocopies per month under the Department of Corrections' (DOC) policy. Hewes asked the librarian at the prison to make him 704 photocopies to serve the eleven defendants a copy of his petition for review. The librarian refused because his request exceeded the number of free photocopies allowed under DOC's policy. Hewes then sought and obtained money to make the photocopies that he wanted from his brother on January 14, 2002. Hewes received notice that the money had been deposited in his prison account on January 15 or 16, 2002.

For reasons relating to fire and security, prison policy limits the amount and type of property that an inmate may keep in his cell. Under the DOC policy, Hewes may keep two 4" legal accordion folders of legal materials. On January 19, 2002, Sergeant Roberts and Brian Abbott informed Hewes that he had legal materials in excess of the amount allowed under the policy in his cell and told him to remove the excess. Hewes admits that he was storing materials in excess of that allowed under the policy in his cell. Hewes refused to remove any of the legal materials from his cell. When Hewes refused, Sergeant Roberts and Brian Abbott's removed the excess material.

Legal materials of prisoners in excess of the allowable amounts are stored in a

locked file cabinet maintained in the unit. If a prisoner needs these materials, the prisoner may request a care and treatment worker or caseworker to retrieve them. A prisoner must be specific about which materials he wants and must be prepared to exchange unused material to stay within the allowable limits. Hewes was aware of the procedure for retrieving the legal materials that had been removed from his cell. Hewes never requested that any of the stored legal materials be retrieved. He states that he did not request to retrieve any legal materials pertinent to his Rule 80C appeal from the locked unit's cabinet because he was not willing to give up for storage certain legal materials in his cell in exchange for his Rule 80C appeal materials. Hewes voluntarily dismissed his Rule 80C appeal.

### Hewes's Claim against Anne Rourke

Hewes sent a letter to Warden Jeffrey Merrill and Deputy Warden Al Barlow dated June 17, 2002, alleging, among other things, that Assistant Attorney General Diane Sleek deliberately misinformed prison advocate Anne Rourke about which disciplinary policy actually governed prisoners between February 1, 2002, and May 2, 2002. Hewes asserted in his June 17, 2002, letter that Disciplinary Policy 15.1 not Disciplinary Policy 20.1, was the policy actually in effect between February 1, and May 2, 2002. Hewes further asserted in his June 17, 2002, letter that under policy 15.1, any disciplinary write-ups against prisoners involved in the April 5, 2002, incident should have been dismissed as untimely under the time limit set forth in policy 15.1. Hewes also demanded financial compensation for all prisoners that were found guilty of disciplinary infractions arising out of the April 5, 2002, incident or were held on administrative segregation for more than two days.

Merrill responded to Hewes's January 17, 2002, letter by letter dated July 9, 2002. Merrill noted that Hewes was not disciplined as a result of the April 5, 2002, incident and declined to discuss the discipline imposed on other prisoners. Merrill suggested that Hewes discuss his concerns with prisoner advocate Anne Rourke.

By letter dated July 22, 2002, Hewes wrote to Rourke requesting information on how she intended to represent him and other prisoners involved in the April 5, 2002, incident with respect to the alleged harm that they suffered from the negligent application of allegedly invalid rules. By memo dated August 22, 2002, Rourke advised Hewes that—based on information that she had received from Robert Costigan, assistant to the warden—policy 20.1, not policy 15.1, was in effect as an emergency rule on April 5, 2002. Hewes believes that Rourke gave him this information to intentionally deceive him because when he subsequently spoke to her about the allegedly illegal rules, Rourke appeared to be mouthing Hewes's exact words as he was speaking. Hewes also believes that Rourke failed to adequately investigate with the Secretary of State's Office the allegations of alleged illegal rulemaking.

### Hewes's Grievance Regarding Rourke and Rulemaking

Hewes filed a grievance dated August 27, 2002, complaining that advocate Rourke had disregarded her obligation to investigate his complaint that disciplinary policy 20.1 and the rules in the prisoner's handbook were never promulgated under the Maine Administrative Procedures Act. According to the grievance records, the grievance was received by the Grievance Review Officer, Robert Costigan on August 30, 2002. Costigan responded on September 23, 2002, by informing Hewes that although he understood that Hewes

disagreed, he was satisfied that the appropriate procedures were followed in the adoption of disciplinary policy 20.1.

Hewes sought a second level review of this grievance to Warden Merrill. Merrill responded on October 14, 2002, by informing Hewes that disciplinary policy 20.1, dated February 1, 2002, was in effect until April 29, 2002, and that any disciplinary violations that occurred on April 5, 2002, were processed in accordance with policy 20.1. Merrill also advised Hewes that Rourke had provided prisoners with correct information. Hewes sought a third and final review of Merrill's response to his grievance with Magnusson. Magnusson construed the grievance as one challenging the DOC's adoption of the disciplinary policy in February 2002 and denied the grievance as untimely as it had not been filed until August 2002.

### Hewes's Resignation of Pod Cleaning Job

On September 2, 2002, Hewes learned that a memo had issued stating that all pod workers working 9:00 a.m. to 5:00 p.m. had to take morning recreation. The memo entitled "Prison Recreation Periods" assigns specific recreation periods to prisoners housed in the Close to Medium Housing Unit based upon their status as unassigned, a.m. workers, p.m. workers, on cell restrictions, or 4:00 p.m. to 9:00 p.m. workers. Handwritten on the memo is the date "8–27–02" and "Captain Hamm." Hewes quit his pod cleaning job rather than risk contact with certain prisoners assigned to morning recreation. Hewes believes that Hamm and others put this schedule into place to retaliate against him. Hewes has no evidence other than the "sequence of events" that Hamm or other prison officials put the schedule into place to retaliate against him.

### Hewes's Failure to Obtain a Paying Job

Hewes has never applied for a paying job at the MSP because he is not qualified for any of those jobs. Hewes has never sought training or education necessary to obtain a paying job at the prison because he wants to spend his time working on legal matters. After quitting his pod cleaning job, Hewes accepted a job working in the kitchen but worked only about forty-five minutes before quitting. After working this brief period in the kitchen, Hewes remained on standby status and applied for no other jobs between the period September 2002 and March 2003 in order to spend time working on his legal matters.

In March 2003 Warden Merrill issued a memo telling prisoners that prisoners on unassigned status would be released for recreation within their assigned housing area during the a.m. activity period only and would not be permitted to go to the activities building for recreation. Merrill's memo also stated that prisoners on unassigned status would be confined to their cell during the p.m. activity period but would be permitted to eat meals in the dining hall unless restricted for other reasons. A prisoner on unassigned work status must make a request to the sergeant on duty if he wants to go to the law library. The sergeant, upon receiving a request, is to call the librarian to check about the availability of a computer terminal, and if one is available, is to give the prisoner a "movement pass" to the law library.

Hewes requested a job as a pod worker after these rules issued to be able to access the law library and jogging track, to obtain p.m. recreation privileges and to avoid prisoners assigned to a.m. recreation.

### Notice of Claim Under The MTCA

Hewes did not serve a notice of claim under the Maine Tort Claims Act with respect to any of the defendants or events described in his complaint.

### III.  Parsing Hewes's Claims

#### A.  Eighth Amendment claim premised on failure to protect Hewes from Chasse and the unknown inmate

Addressing a claim very similar to this claim by Hewes, the Eleventh Circuit summarized the Eighth Amendment standard for inmate failure to protect claims in the context of summary judgment:

> A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); see Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). " '[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.' " Farmer, 511 U.S. at 833, 114 S.Ct. at 1976. (quotations and citations omitted). "It is not, however, every injury suffered by one inmate at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." Id. at 834, 114 S.Ct. 1970.
>
> "An Eighth Amendment violation will occur when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not 'respond[ ] reasonably to the risk'...." Marsh v. Butler County, Ala., 268 F.3d 1014, 1028 (11th Cir.2001)(en banc), quoting Farmer, 511 U.S. at 844, 114 S.Ct. 1970. "[T]o survive summary judgment on his section 1983, Eighth Amendment claim, [Plaintiff] was required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir.1995).
>
> ...To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a ' "sufficiently culpable state of mind." ' " Farmer, 511 U.S. at 834–38, 114 S.Ct. 1970; Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir.2003). The Eleventh Circuit agreed that at the summary judgment stage the plaintiff must generate sufficient evidence to establish the defendants' subjective awareness of the risk. Id.; see also id. at 1350 (noting that a "generalized awareness of risk in these circumstances does not satisfy the subjective awareness requirement").

With respect to the defendants' awareness of the alleged threat from Chasse, the undisputed material facts are that correctional officers had a report by Hewes of the June 1995 assault on Hewes by Chasse at the Penobscot County Jail. With respect to events at the prison, the kitchen supervisor knew that Hewes was unsure whether or not Chasse carried a grudge against Hewes. On April 28, 1998, Chasse assaulted Hewes outside of the prison cafeteria, a confrontation in which officers intervened.

Years later, when Hewes was released into the A-pod housing unit after being in segregation for the April 5, 2002, prison demonstration he saw Chasse and then requested a transfer from Officer Virgie, telling him about the Penobscot County Jail beating and the 1998 attack at the old prison. Hewes told Virgie that Chasse's animosity stemmed from statements Hewes provided county jail officials. No transfer was arranged by Virgie or Dardis,

with whom Hewes submitted a written request. Hewes did not report to jail staff that some inmates had commented to him that Chasse was showing papers around and Hewes did not at the time believe that he had problems with any other inmates. After that, the May 19 "rapist and rat" confrontation occurred.

■ It is evident from Hewes's deposition testimony that he saw a connection between Chasse and his May 19 confronter but that this connection (which is highly speculative, I must say) is based on what Hewes learned at the time of the confrontation. This record does not support the drawing of any reasonable inference that any of these defendants could have, much less actually *did*, anticipate that this third-party inmate would confront Hewes.[6]

With respect to Hewes's argument that any of these defendants orchestrated the Chasse/Hewes cohabitation with the intent to harm Hewes, there is no record evidence whatsoever to support Hewes's speculation that the defendants sought to harm Hewes by this device. *See Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 24 (1st Cir.2002) ("Painting a pumpkin green and calling it a watermelon will not render its contents sweet and juicy.").

**B. Claims Regarding Hewes's Placement in Administrative Segregation**

Analyzing Hewes's two administrative segregation claims under *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), I conclude that the defendants are entitled to judgment as a matter of law as to both placements. In *Sandin* the United States Supreme Court concluded, with respect to an inmate's liberty interest in being freed from restraint, that to be actionable the restrain must be of a kind that creates atypical and signifi-

cant hardship, and reflected that administrative segregation, in itself, is neither. *Id.* at 483–86, 115 S.Ct. 2293; *see also Austin v. Wilkinson*, 372 F.3d 346, 353 (6th Cir.2004) ("*Sandin* shifted the focus from parsing the language of state statutes and regulations to examining the severity of the conditions to which an inmate would be subject."); *Dominique v. Weld*, 73 F.3d 1156, 1159–61 (1st Cir.1996).

**1. Segregation between April 5, 2002, and May 2, 2002**

■ Hewes wore sweatpants to the chow hall in what the administration took as a demonstration *en mass* challenging the prison policy. He was placed in segregation on the grounds that he posed a threat to security or the orderly management of the facility. *See Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir.2004) (plaintiff must allege that the prison imposed a special housing unit sentence without providing due process; there must be at least " 'some evidence' to support the sanction imposed"). During his segregation he received legal materials. He did lose the possibility of earning goodtime credits but no credits were taken away from him.

**2. Segregation between May 19, 2002, and June 5, 2002**

■ After Hewes's attack by an unknown inmate on May 19, 2002, Hewes requested a transfer. However, Hewes refused to tell the responding officer or the sergeants at the hospital the identity of the person who attacked him, so Ruel ordered that Hewes be placed in administrative segregation for his own safety. In his May 22 appearance before the Administrative Segregation Committee, Hewes continued to refuse to provide any infor-

---

**6.** It is not clear on the record if the third-party did anything physical towards Hewes as

the facts suggest that Hewes may have aggressively disabled the "confronter."

mation about his assailant and Hewes was told that it was not possible to know how to protect Hewes in the general population as a consequence. After a further seven days of segregation, Hewes indicated to the committee that he would be safe in the general population and he was released to a different pod in the Close unit. It is evident from the record before me on this score that the defendants had a legitimate safety reason for placing Hewes in segregation and that Hewes was afforded the necessary process vis-à-vis the determination, *see Ortiz,* 380 F.3d at 655.

### C. Access to the Courts

In *Bounds v. Smith,* the United States Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In a subsequent case, *Lewis v. Casey,* the Court explained:

> Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. That would be the precise analog of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary. Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone," *id.,* at 823, 97 S.Ct. 1491 (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might

show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see also Boivin v. Black,* 225 F.3d 36, 42 (1st Cir.2000). This right of access to courts "does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Casey,* 518 U.S. at 355, 116 S.Ct. 2174.

### 1. Library Schedule

■ The undisputed material facts regarding Hewes's access to the library are that inmates can use the library five days a week during their daily three-hour recreation period. It is Hewes's complaint that his laundry duties and hygiene needs limited his access to four and one-half hours a week. Hewes had the opportunity to take books back to his cell and to request additional library time if necessary to meet court deadlines. Hewes requested this time once (and only once) and this was vis-à-vis his habeas petition and this request was denied. However, it is clear from this court's own adjudication of that petition that that single denial of extra time had no material impact on the disposition of Hewes's habeas. *See Hewes v. Warden,* Civ. No. 00–351, 2001 WL 327847, *2 (D.Me. Apr. 4, 2001) (concluding apropos the 28 U.S.C. § 2254 period of limitations that it expired on June 18, 1998, and Hewes's petition was filed on October 27,

2000).[7]

## 2. Placement in Administrative Segregation

■ With respect to Hewes's access to the court that might have been impacted by his administrative segregation in the periods between April 5, 2002, and May 2, 2002, and again between May 19, 2002, and June 5, 2002, the only court proceeding potentially impacted by these periods of administrative segregation was Hewes's "petition for review." On March 12, 2002, the Supreme Court returned the petition to Hewes, indicating that it was not in conformance with the Court's rules. Apparently all that was required of Hewes was to attach a copy of the lower courts' opinions. It was Hewes's own determinations about the Supreme Court's errors and the effect his motion for reconsideration filed with the First Circuit would have on his ability to seek Supreme Court review that stymied his efforts to plead his case to the Supreme Court.

## 3. Limitation on Free Photocopies

■ With respect to any claim that Hewes was denied adequate photocopies to accomplish service of his Rule 80C petition on eleven defendants, the prison's policy allowing 100 *free* copies is not constitutionally actionable as it cannot be said on the facts above that this limitation on gratuitous copies prevented Hewes from exer-

cising his constitutional right of access to the courts. *See Bounds,* 430 U.S. at 821, 97 S.Ct. 1491; *see also, e.g., Wanninger v. Davenport,* 697 F.2d 992, 994 (11th Cir. 1983); *Jones v. Franzen,* 697 F.2d 801, 803 (7th Cir.1983); *Johnson v. Parke,* 642 F.2d 377 (10th Cir.1981). Hewes's arguments to the contrary are unconvincing. (Pls.' Mot & Resp. ¶ 5.) Furthermore, his laundry list of documentation that he was unable to copy due to the policy which is the brunt of Hewes's memorandum (*see id.* ¶¶ 6–17)including the daily laundry schedule that Hewes so strenuously insists would further his claims -would not shift my conclusion *even if* Hewes had actually presented his evidence concerning the photocopies denied and explained their probative nature vis-à-vis his legal action in a form cognizable in summary judgment.

It is also Hewes's contention that when Merrill became aware of the funds for photocopies Hewes procured from his brother, Merrill and correctional officers joined forces to take Hewes's legal materials without proper notice or opportunity for a hearing.[8] These defendants also took this initiative, according to Hewes, in the hopes of concealing their conspiracy, thereby causing Hewes physical and mental harm/anguish. The summary judgment record contains no evidence of such a conspiracy. Hewes admitted in his deposition that he was in violation of prison policy when the legal materials were re-

---

7. In his memorandum and response Hewes contends in a conclusory manner that the library access restriction prevented him from recognizing that a Maine State Crime Lab Report was newly discovered evidence which could have formed the basis for an evidentiary hearing in his criminal case. (Pls.' Mot & Resp. ¶ 8(9).) Even if this paragraph and some record support thereof was properly before me, I cannot see how increasing the rather ample law library time provided Hewes would have helped him obtain the law enforcement documentation and inquire into the forensic tests.

8. Hewes argues that the photocopy policy also limited his ability to prove that the defendants are requiring that inmates allow their blood to be drawn pursuant to a Department of Corrections memorandum. This information, Hewes believes, could be used to impeach Magnusson and Merrill at his trial on this complaint as it would demonstrate that they willingly assisted employees from the judicial branch in this manner. (*See Id.* ¶¶ 8.) In Hewes's world view this information would help prove that prisoners are being denied adequate law time and that there is an associated conspiracy. (*id.*)

moved. He was aware at the time that he was limited to two legal-sized accordion folders of legal materials and that he could access stored materials on request. There is no credible evidence of a retaliatory conspiracy or of a due process infringement vis-à-vis Hewes's storage of legal materials in his cell. (*See* Pl.'s Mem. & Resp. ¶ 15.)

### D. Claims apropos the Adoption of the Emergency Rulemaking

#### 1. Removal of Notices from Newspapers

■ I cannot identify any constitutional right that Hewes had vis-à-vis the alleged removal of notices from the newspapers during the adoption of the emergency rule under the Maine statutes, *see* 5 M.R.S.A. § 8054 (2002). If Hewes is asserting some sort of due process theory, Hewes, as the defendants point out, had the ability to challenge the rulemaking process under state law, *see id.* §§ 8054(2), 8058. What is more, there is no indication that Hewes was charged with a violation of the rule in question. Perhaps most important, there is no evidence before me that supports a reasonable inference that Magnusson or Merrill had prison personnel cut the notice of the agency rulemaking vis-à-vis disciplinary policy 20.1 out of newspapers.[9]

#### 2. Rourke's Failure to Advocate on Hewes's Behalf vis-à-vis Rulemaking

This claim is predicated on Hewes's argument that disciplinary policy 15.1 rather than 20.1 should have governed disciplinary adjudications arising from the April 5, 2002, sweat pant incident. After airing his discontent to Barlow and Merrill, Hewes sent a letter to Rourke asking for information as to how she intended to represent Hewes and other inmates involved in the April 5 incident who were exposed to the negligent application of the allegedly invalid rules. Rourke responded that, based on the information she collected, policy number 20.1 and not policy number 15.1 was in effect on April 5. Hewes charges Rourke not only with failing to take her investigation far enough, but with intentionally deceiving him, a deception demonstrated by the fact, at some point during their discussions, Rourke was lip-synching his words. Hewes grieved both Rourke's want of advocacy and the rulemaking to no avail, the consensus being that policy 20.1 was indeed in effect at the relevant time.

■ With respect to Rourke's advocacy, I cannot identify any *constitutional* right that Hewes has to her assistance in advancing challenges of this ilk. *Bounds* certainly does not suggest that Hewes has a constitutional right to such assistance.[10]

### E. Suspension from Job as Janitor in the Education Department and Hewes's Related Conspiracy Claim

It is undisputed that Hewes refused Black's order to prepare a written job description. Hewes was able to take his

---

**9.** In his memorandum Hewes states that the photocopy policy prevented him from copying articles from the *Bangor Daily News* dated February 13, 2002, and June 12, 2002, which indicate that Policy 20.1 is being adopted. (Pl.'s Mot. & Resp. ¶ 9.) He also sought to photocopy an affidavit of Franklin Higgins which would demonstrate how he obtained the copy of the June 12, 2002, paper. (*Id.* ¶ 13(11).) All this would prove is that the notice was published, not that the defendants had the notice excised from certain copies.

**10.** Once again it is Hewes's contention that the denial of adequate free photocopying prevented him from demonstrating Rourke's advocacy shortcomings. (Pl.'s Mot. & Resp. ¶ 16.) And, once again, Hewes does not identify what is the nature of the documentation material to this claim.

plaint to the classification committee to which he admitted that he had indeed refused Black's instruction. He was also able to appeal its decision upholding of the dismissal. He even got the complaint in front of Commissioner Magnusson via an unorthodox avenue. Furthermore, Hewes filed a Maine Rule of Civil Procedure 80C petition for judicial review of his suspension which he voluntarily dismissed.

■ Little needs to be said about this claim concerning loss of work privilege, as it is clear that it has no merit as a due process claim on the undisputed facts before me. *See Dominique,* 73 F.3d at 1159–61. And, with respect to Hewes's conspiracy theories that the loss of his job and the subsequent decisions upholding Black's decision was in retaliation for Hewes's litigious activities and that the classification committee was involved in some sort of cover-up in denying Hewes "proper notification" of Black's authority to suspend him, I cannot see my way to drawing any reasonable inference in Hewes's favor on this score so as to allow such claim to go forward.[11] The same must be said on the allegations in Paragraph 189 of Hewes's complaint concerning the use of "standby status" by prison personnel as a tool of physical and mental cruelty to leverage free labor from the inmates and to punish inmates who litigate against the Department of Corrections.

### F. Complaint Paragraph 183

I also conclude that the defendants are entitled to summary judgment as to the allegations in Paragraph 183. Therein Hewes's claims that defendants Riley,

Costigan, Merrill, and Magnusson, "united together" to perform their normal habit of practice during Hewes's disciplinary appeals and job dismissal by knowingly disregarding the principles of their administrative procedures and law, thereby denying Hewes of due process. The defendants bravely attempt to construe this as a coherent constitutional claim. In my view this paragraph could be properly dismissed for failure to state a claim and is certainly susceptible to summary judgment in the defendants' favor in view of my discussion of the related grounds above.

### G. Hewes's Discrimination Claim apropos Some Jobs Being Paid and Others Not

■ The undisputed material facts bare out that Hewes has never applied for a paying job at the prison because he is not qualified for such a position. Hewes has never sought the necessary training or education to qualify for a paying position, preferring to devote his time to his sundry legal matters. In September 2002 Hewes learned that all pod-workers working 9:00 a.m. to 5:00 p.m. had to take morning exercise. Hewes quit his pod cleaning job on his own accord to avoid contact with certain prisoners. Thereafter, he accepted a position in the kitchen which he quit after forty-five minutes on the job. Hewes has not generated a genuine dispute of material fact supporting an equal protection theory. And, once again, I cannot reasonably draw an inference that the schedule that exposed Hewes in his pod-cleaner capacity to certain inmates was calculated to punish Hewes in someway. Hewes points to the "sequence of events"

---

11. In his memorandum Hewes claims that the limitations on photocopies prevented him from copying ninety pages of documentation that would have demonstrated that prison officials and employees conspired to retaliate against him for his litigation. (Pl.'s Mem. & Resp. ¶ 14.) However, beyond the list of various legal materials, statutes, rules, and records in his other paragraphs, he in no way identifies what the evidence of the conspiracy was that he was unable to copy.

in support of this retaliation claim; this is conjecture of the sheerest, most self-serving variety and is not enough to carry his burden at this stage of the litigation.

### H. State Law Claims

Finally, there is no dispute that Hewes failed to comply with the notice provisions of the Maine Tort Claims Act. In his memorandum Hewes states only that the notice provisions do not apply to 42 U.S.C. § 1983 actions. The defendants are entitled to summary judgment as to all of Hewes's state law claims.

### Conclusion

For these reasons I now **GRANT** summary judgment in favor of the defendants as to all of Hewes's claims.